## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GARY R. BUTTERS, as Co-Trustee of THE BUTTERS CLINTON COUNTY GAS PROTECTOR TRUST, DAVID F. BUTTERS, individually, TERRY L. BUTTERS, individually, and GLEN E. BUTTERS, individually, | : : : : : : : | CIVIL ACTION NO. 4:17-CV-797 (Chief Judge Conner) |
| **Plaintiffs** | : : | |
| **v.** | : : | |
| SWN PRODUCTION COMPANY, LLC, | : : | |
| **Defendant** | : | |

## <u>MEMORANDUM</u>

Plaintiffs commenced this action against defendant SWN Production Company, LLC ("SWN") to quiet title under Pennsylvania Rule of Civil Procedure 1061(b)(3) and for declaratory judgment under 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57. (Doc. 7). SWN moves to dismiss plaintiffs' amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 15).

## I. <u>Factual Background & Procedural History</u>

### A. Subject Properties and Lease Execution

Plaintiffs own several tracts of real property totaling approximately 445.61 acres in Morris Township, Tioga County, Pennsylvania that are subject to oil and gas leases. (Doc. 7 ¶¶ 11, 15). In 1997, Raymond G. Butters and Peggy A. Butters conveyed their interest in subterranean oil and gas associated with two parcels of land containing approximately 100.42 and 142.42 acres ("242 Acre Tract"), to the

Butters Living Trust. (Id. ¶¶ 12-13). Two years later, Roger W. Mitschele, Jr. and Keith E. Mitschele conveyed title and interest in two parcels of land comprising approximately 214.15 acres ("214 Acre Tract," and together with the 242 Acre Tract, the "subject properties") to plaintiffs David F. Butters and Terry L. Butters. (Id. ¶ 14).

The Butters Living Trust leased the 242 Acre Tract to Jim Bourbeau Land Service, LLC ("Bourbeau") on December 8, 2005. (Id. ¶ 16; Doc. 7-7). David F. Butters and Terry L. Butters leased the 214 Acre Tract to Bourbeau on the same day. (Doc. 7 ¶ 17; Doc. 7-8). Each lease established a primary term of five years for the leases. (Doc. 7 ¶ 18; Doc. 7-7 at 3; Doc. 7-8 at 3). As lessee, Bourbeau could extend the primary term by an additional five years from the original expiration date at a cost of $45 per net-acre. (Doc. 7 ¶ 19; Doc. 7-7 at 7 C.12th; Doc. 7-8 at 7 C.12th).

## B.    Relevant Lease Provisions

The leases each contain a habendum clause setting forth five alternative conditions by which the lessee could extend the leases beyond the primary term. (Doc. 7 ¶ 20; Doc. 7-7 at 5 C.11th; Doc. 7-8 at 5 C.11th). The habendum clause provides that the leases will "remain in full force and effect" beyond the primary term and

> as long thereafter as (1) drilling operations continue with due diligence, provided that LESSEE has commenced drilling operations on any portion of the premises or any lands pooled or unitized therewith, within the primary term, (2) an application for a drilling permit is pending with the appropriate authorities, and LESSEE, after grant of such permit, commences drilling operations

2

within a reasonable time thereafter and continues same
with due diligence, provided said permit application was
filed prior to the expiration of the primary term, (3) oil
and gas or either of them is produced or withdrawn from
any portion of the premises or any lands pooled or
unitized therewith, (4) gas storage operations are
conducted in or on any portion of the premises or (5) a
completed oil or gas well would be capable of producing
oil or gas from any portion of the premises or any lands
pooled or unitized therewith, but for acts of God,
unavailability or interruption of markets or pipelines,
delays due to pending governmental or regulatory
authorization, or any other causes, which have caused
LESSEE not to commence production from such well or
to suspend production from such well.

(Doc. 7 ¶ 20; Doc. 7-7 at 3; Doc. 7-8 at 3). The leases provide the definition of

"operations" in paragraph C.11th:

Operations. Whenever used in this lease, the word
"operations" (unless specified to the contrary) shall
mean operations for and any of the following: dirt work,
building of roads and locations, drilling, testing,
completing, reworking, recompleting, deepening,
plugging back, repairing, abandoning or dewatering
(meaning pumping or flowing of water and/or associated
hydrocarbons from a well) of a well in search of or in an
endeavor to obtain, increase or restore and/or market or
render marketable or more valuable production of oil or
gas, and/or production, actual or constructive, of oil or
gas.

(Doc. 7-7 at 5 C.11th; Doc. 7-8 at 5 C.11th).

The leases also set forth a notice requirement which reads:

All expressed or implied covenants of this Lease shall be
subject to all federal, state and local laws, orders, rules
and regulations. If LESSEE is unable to fulfill any
covenant hereunder because of such laws, orders, rules or
regulations, acts of God (such as natural disasters), wars,
civil disturbances, insurrections, riots, epidemics,
equipment or pipeline breakdown or freeze-up, or similar
causes not reasonably within the control of LESSEE, for

such time as such situation exists, the term of this Lease shall be extended for an equal period of time, and LESSEE's obligation to fulfill its covenants under this Lease shall be suspended for such period of time. This Lease shall not be terminated, in whole or in part, nor Lessee held liable for any failure to perform unless such obligation, covenant or condition remains unsatisfied and unperformed for a period of one year following the express and specific written demand upon Lessee by Lessor for such satisfaction and performance. Neither the service of said notice nor the doing of any acts by Lessee intended to satisfy any of the alleged obligations shall be deemed an admission or presumption that Lessee has failed to perform all its obligations hereunder. No judicial action may be commenced by Lessor for forfeiture of this lease or for damages until after said period. Lessee shall be given a reasonable opportunity after judicial ascertainment to prevent forfeiture by discharging its expressed or implied obligation as established by the court.

(Doc. 7-7 at 5 C.7th; Doc. 7-8 at 5 C.7th).

## C. Lease Assignments and Transfers

Bourbeau assigned its interest in the leases to Anadarko E&P Company, LP ("Anadarko") in February 2007. (Doc. 7 ¶ 29). Anadarko assigned a 50% interest in the leases to Chesapeake Appalachia, LLC ("Chesapeake") effective September 1, 2006. (Doc. 7 ¶ 30; Doc. 7-13). Chesapeake thereafter transferred a 32.5% interest in the leases to StatoilHydro USA Onshore Properties, Inc. ("Statoil") effective November 17, 2008. (Doc. 7 ¶ 31; Doc. 7-14).

The Butters Living Trust transferred its interest in the 242 Acre Tract to various members of the Butters family in 2011. (Doc. 7 ¶ 22). Plaintiffs David F. Butters and Terry L. Butters each received an undivided 35% interest in the 242 Acre Tract. (Id. ¶¶ 23-24). The Butters Living Trust conveyed an undivided 15%

interest in the 242 Acre Tract to plaintiff Glen E. Butters. (Id.) Plaintiff Butters Clinton County Gas Protector Trust (the "Trust"), executed on November 16, 2010, received an undivided 15% interest in the 242 Acre Tract. (Id. ¶¶ 23-25).

Chesapeake and Statoil assigned their combined 50% interest in the leases to SWN effective January 1, 2013.[1] (Id. ¶ 33; Doc. 7-16). Anadarko also assigned 32.5% of its interest in the leases to Mitsui E&P USA, LLC ("Mitsui") effective July 20, 2012. (Doc. 7 ¶ 34; Doc. 7-17). Anadarko assigned the remainder of its interest in the leases to SWN effective September 1, 2014. (Doc. 7 ¶ 36; Doc. 7-19). At the conclusion of the leases' primary terms on December 8, 2015, SWN and Mitsui held "the totality of the working interest in the [l]eases." (Doc. 7 ¶ 38; see also Doc. 30 at 7).

### D. Drilling Activity

#### 1. *The Broughton Unit*

Chesapeake applied for a permit in January 2011 to drill a horizontal well, known as the "Broughton #5H Well," in the Marcellus Shale formation. (Doc. 7 ¶ 39; Doc. 8). After receiving the permit, Chesapeake executed a "Declaration and Notice of Pooled Unit" on April 1, 2011 to establish the "Broughton Unit," which contained the Broughton #5H Well. (Doc. 7 ¶¶ 40-41, 44; Doc. 8-1). According to plaintiffs, no portion of the subject properties governed by the leases was "unitized" or "pooled" into the Broughton Unit. (Doc. 7 ¶¶ 42-43; see also Doc. 8-2). Drilling of

---

[1] At the time of this assignment, SWN operated under the name Southwestern Energy Production Company. (Doc. 7 ¶ 37; Doc. 7-20). Southwestern Energy Production Company converted to SWN on November 6, 2014. (Doc. 7-20 at 3).

the Broughton #5H Well commenced on April 8, 2011 and concluded on May 9, 2011. (Doc. 7 ¶¶ 45-46).

SWN acquired the Broughton #5H Well on April 3, 2015 following regulatory approval. (Id. ¶¶ 54-55). On June 5, 2015, SWN filed an application for inactive well status for the Broughton #5H Well with the Pennsylvania Department of Environmental Protection. (Id. ¶ 56; Doc. 8-8). The Broughton Unit dissolved on May 1, 2015 due to "a failure to establish unit production and the proper development of the reservoir underlying the Leases." (Doc. 7 ¶¶ 60-61 (quoting Doc. 8-9 at 3)). Plaintiffs aver that the Broughton #5H Well was never perforated, hydraulically stimulated, connected to a pipeline, or capable of producing hydrocarbons. (Id. ¶¶ 47, 57).

### 2. *The Broughton South Drilling Unit*

SWN, Mitsui, and a third party executed a joint declaration of pooling on September 3, 2015 to establish the "Broughton South Drilling Unit." (Id. ¶ 62; Doc. 8-10). The Broughton South Drilling Unit included portions of the subject properties. (Doc. 7 ¶ 64; Doc. 8-10). The Broughton #5H Well was incorporated into the Broughton South Drilling Unit. (Doc. 7 ¶ 118). SWN received a permit on August 20, 2015 to establish the "Broughton #3H Well" in the Broughton South Drilling Unit. (Id. ¶¶ 65-66, 75; Doc. 8-11; Doc. 8-12). The permit contained an expiration date of August 20, 2016 "unless drilling is commenced on or before that date and prosecuted with due diligence." (Doc. 7 ¶ 67 (quoting Doc. 8-12 at 3)).

SWN purportedly "spudded"—or commenced the well-drilling process for— the Broughton #3H Well on December 7, 2015. (Id. ¶¶ 68-69). Plaintiffs aver that

the Broughton #3H Well, like the Broughton #5H Well, was never perforated, hydraulically stimulated, connected to a pipeline, or capable of producing hydrocarbons.  (Id. ¶ 70).  They also aver that the Broughton #3H Well consisted of only a conductor hole and that no further drilling operations occurred anywhere in the Broughton South Drilling Unit from December 8, 2018 to July 2016.  (Id. ¶¶ 69, 71).  SWN filed another permit application in July 2016 for the Broughton #3H Well, wherein it represented that the original permit expired.  (Id. ¶¶ 72-73; Doc. 8-13 at 4).

### 3.    *The Long Run Timber TI-24 East Gas Unit*

SWN and Mitsui executed a joint declaration of pooling to create the "Long Run Timber TI-24 East Gas Unit" on or before the expiration date of the leases' primary term.  (Doc. 7 ¶ 76, 150-51; Doc. 8-14).  The Long Run Timber TI-24 East Gas Unit included a small portion of the 214 Acre Tract.  (Doc. 7 ¶ 77).  On December 10, 2015, SWN submitted a well permit application with the Pennsylvania Department of Environmental Protection for the "Long Run Timber A #4H Well," two days after expiration of the leases' primary term.  (Id. ¶¶ 78-79; Doc. 8-15).

### E.    **Primary Term Expiration**

The leases' primary terms expired on December 8, 2015.  (Doc. 7 ¶ 80; see also Doc. 7-7 at 3, 7 C.12th; Doc. 7-8 at 3, 7 C.12th).  Plaintiffs assert that at the expiration of the leases' primary terms, portions of the subject properties were unitized in two drilling units—the Broughton South Drilling Unit and the Long Run Timber TI-24 East Gas Unit—and that no completed wells existed in either unit.  (Doc. 7 ¶¶ 81-82).

On October 10, 2016, plaintiffs' requested by letter that SWN record a release or surrender of the two leases pursuant to 58 PA. STAT. AND CONS. STAT. ANN. § 903,[2] for failure to satisfy any of the habendum clause conditions to extend the leases beyond the primary term.  (Id. ¶¶ 86-87; Doc. 8-16).  SWN rejected plaintiffs' request by letter on October 19, 2016, contending that the leases were still valid because "drilling operations" had commenced on the Broughton #5H Well and Broughton #3H Well during the primary term.  (Doc. 7 ¶¶ 88-89; Doc. 8-17).  SWN also set forth a list of activities associated with the Broughton #5H Well and Broughton #3H Well undertaken prior to the expiration of the leases' primary term.  (Doc. 7 ¶ 89 (quoting Doc. 8-17 at 3)).  SWN also identified several operations on the Broughton South Drilling Unit scheduled for "the near future."  (Id. (quoting Doc. 8-17 at 3)).

### F.  Procedural History

Plaintiffs[3] commenced the instant action against SWN in the Court of Common Pleas of Tioga County, Pennsylvania.  (Doc. 1-2).  SWN removed the case to federal court on diversity grounds.  (Doc. 1).  On May 18, 2017, plaintiffs filed an amended complaint adding Mitsui as a defendant.  (Doc. 7).  Therein, plaintiffs assert two claims: an action to quiet title pursuant to Pennsylvania Rule of Civil

---

[2] Section 903 requires a lessee to deliver to the lessor a surrender document in recordable form "[n]ot more than 30 days after the termination, expiration or cancellation of an oil or natural gas lease."  58 PA. STAT. AND CONS. STAT. ANN. § 903(a).

[3] Plaintiffs are Gary R. Butters, as Co-Trustee of the Trust, David F. Butters, Terry L. Butters, and Glen E. Butters (hereafter, "plaintiffs").

Procedure 1061(b)(3) (Count I) and a request for declaratory relief pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 (Count II).

SWN and Mitsui each moved to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6). (Docs. 15, 18). Plaintiffs thereafter filed a notice of voluntary dismissal of Mitsui. (Doc. 46). SWN's motion is fully briefed and ripe for disposition.

## II.  Legal Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6). When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. Cty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)). In addition to reviewing the facts contained in the complaint, the court may also consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994); Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly,

550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts a three-step inquiry.  See Santiago v. Warminster Twp., 629 F.3d 121, 130-31 (3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"  Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded.  Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 556.  A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.

### III.  Discussion

The instant dispute concenters upon the continuing validity of two oil and gas leases.  Plaintiffs assert that SWN failed to prosecute drilling operations continuously and with due diligence on the subject properties and that the leases therefore expired on December 8, 2015.  In Count I, plaintiffs request that the court (1) find that plaintiffs own in fee simple the hydrocarbon formations underlying the subject properties, and (2) direct SWN to relinquish the leases or record a release or surrender document with the appropriate state entity.  And in Count II, plaintiffs seek a declaratory judgment that (1) the leases terminated on December 8, 2015,

and (2) that SWN must surrender and release all hydrocarbon formations underlying the subject properties and the leases governing same.

SWN contends that plaintiffs' quiet title claim must be dismissed because plaintiffs do not actually possess the subject properties. As to plaintiffs' declaratory judgment claim, SWN's argument is twofold: *first*, that this action is premature because the leases' notice clause required plaintiffs to provide written demand for performance to SWN and a period of one year to cure before commencing judicial proceedings; and *second*, that the leases are extended as a matter of law because SWN commenced and continued "drilling operations" as defined in the leases. Resolution of each of these arguments turns on threshold questions of contract interpretation.

### A.     Principles of Contract Interpretation[4]

Issues of contract interpretation form the core of the parties' dispute. The foremost consideration in interpreting contracts, including oil and gas leases, is determining the contracting parties' intent. See Hutchinson v. Sunbeam Coal Corp., 519 A.2d 385, 389-90 (Pa. 1986). Such interpretation generally is a question of law, tasking the court to discern the respective parties' intents "as manifestly expressed" through the prism of the written agreement itself. Willison v. Consol.

---

[4] Pennsylvania substantive law governs this diversity action. See Lafferty v. St. Riel, 495 F.3d 72, 76 (3d Cir. 2007) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)). Under Pennsylvania law, an oil and gas lease is considered to be of the same nature as a contract. See T.W. Phillips Gas & Oil Co. v. Jedlicka, 42 A.3d 261, 267 (Pa. 2012) (citing Willison v. Consol. Coal Co., 637 A.2d 979, 982 (Pa. 1994)); Hutchinson v. Sunbeam Coal Corp., 519 A.2d 385, 389-90 (Pa. 1986). Hence, the instant dispute is controlled by the same principles which govern Pennsylvania contract law. See Jedlicka, 42 A.3d at 267 (citing Willison, 637 A.2d at 982).

Coal Co., 637 A.2d 979, 982 (Pa. 1994).  The court must interpret the writing "as a whole, giving effect to all its provisions."  McWreath v. Range Res.-Appalachia, LLC, 645 F. App'x 190, 193 (3d Cir. 2016) (nonprecedential) (quoting Atl. Richfield Co. v. Razumic, 390 A.2d 736, 739 (Pa. 1978)).

Pennsylvania contract interpretation principles begin with the "firmly settled" principle that the intent of the contracting parties should be gleaned from the writing itself.  Norfolk S. Ry. Co. v. Pittsburgh & W. Va. R.R., 870 F.3d 244, 253 (3d Cir. 2017) (citations omitted)).  The court must be guided by the plain meaning of the language employed by the parties rather than their "silent intentions."  T.W. Phillips Gas & Oil Co. v. Jedlicka, 42 A.3d 261, 267 (Pa. 2012).  However, when a portion of a lease is ambiguous, the court may examine extrinsic evidence to resolve the ambiguity.  Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co., 905 A.2d 462, 469 (Pa. 2006); Hutchinson, 519 A.2d at 390.  Under Pennsylvania law, it is the court's obligation to determine whether an agreement is ambiguous.  See Hutchinson, 519 A.2d at 390.  An ambiguous writing is interpreted by the finder of fact.  Ins. Adjustment Bureau, 905 A.2d at 469 (citing Kripp v. Kripp, 849 A.2d 1159, 1163 (Pa. 2004)).

Oil and gas leases represent a property conveyance "within a highly technical and well-developed industry," such that industry concepts are necessary considerations when interpreting lease terms.  Jacobs v. CNG Transmission Corp., 332 F. Supp. 2d 759, 772 (W.D. Pa. 2004); see also Nolt v. TS Calkins & Assocs., LP, 96 A.3d 1042, 1046 (Pa. Super. Ct. 2014).  A court should not consider the terms of such agreements in isolation, but rather must construe them "with due regard to

the known characteristics" of the particularized nature of the oil and gas industry.
Camp Ne'er Too Late, LP v. Swepi, LP, 185 F. Supp. 3d 517, 544 (M.D. Pa. 2016)
(citing Franklin Sugar Ref. Co. v. Howell, 118 A. 109, 110 (Pa. 1922)); Roe v. Chief
Expl. & Dev. LLC, No. 4:11-CV-816, 2013 WL 4083326, at *5 (M.D. Pa. Aug. 13, 2013)
(same); Good Will Hunting Club, Inc. v. Range Res., Inc., No. 4:11-CV-1152, 2012 WL
722614, at *3 (M.D. Pa. Mar. 1, 2012) (same).

   **1.**  ***Notice Clause***

  SWN first asserts that plaintiffs' filing of the instant action is premature
because plaintiffs failed to abide by Section C.7th of the leases. (Doc. 30 at 22).
That section provides that the leases shall not be terminated for SWN's failure to
perform "unless such obligation, covenant or condition remains unsatisfied and
unperformed for a period of one year following the express and specific written
demand . . . for such satisfaction and performance." (Doc. 7-7 at 5 C.7th; Doc. 7-8 at
5 C.7th). SWN maintains that plaintiffs commenced the above-captioned action
approximately six months after providing express and specific written demand in
the form of the October 10, 2016 release or surrender letter. (Doc. 30 at 22-23).
Plaintiffs respond that the notice clause pertains only to obligations, covenants, and
conditions separate and apart from the conditions in the habendum clause, which
sets forth the nature of the title conveyed in each lease. (Doc. 28 at 20-21).

  An oil and gas lease conveys inchoate title for the initial purpose of
exploration and development. Jedlicka, 42 A.3d at 267 (citations omitted). No
estate vests in the lessee if development during the primary term is unsuccessful.
Id. A fee simple determinable is created in the lessee when oil or gas is produced

and the lessee's "right to extract the oil or gas becomes vested." Id.; see also Jacobs, 332 F. Supp. 2d at 772-73. A fee simple determinable "automatically reverts to the grantor upon the occurrence of a specific event." Jedlicka, 42 A.3d at 267 (citing Brown v. Haight, 255 A.2d 508, 511 (Pa. 1969)). The habendum clause "creates a fee simple determinable in the lessee" through words of "indubitable limitation"—including, *inter alia*, "so long as"—and gives the lessor "a possibility of reverter." Jacobs, 332 F. Supp. 2d at 773 (quoting Higbee Corp. v. Kennedy, 428 A.2d 592, 595 (Pa. Super. Ct. 1981)) (citing Brown, 255 A.2d at 512).

SWN's proposed interpretation of the notice clause is inconsistent with settled law on the operation of habendum clauses. The parties and their privies clearly contracted to create a fee simple determinable. The leases' habendum clauses employ words of indubitable limitation, *viz.*, that the leases "shall remain in full force and effect . . . *as long thereafter as*" any one of five conditions is met. (Doc. 7-7 at 3 (emphasis added); Doc. 7-8 at 3 (emphasis added)). As a matter of law, the property interest conveyed by the leases automatically reverts to the lessors if none of the habendum clauses' five conditions are met. See Jedlicka, 42 A.3d at 267. We interpret the leases as conveying to SWN a fee simple determinable with a possibility of reverter.

SWN asserts that Section C.7th entitled it to express notice of any purported failure to conduct drilling operations with due diligence and one year to cure said failure of performance. (Doc. 30 at 22; Doc. 26 at 3). Such an interpretation renders the durational language of the habendum clause meaningless. By its nature, a possibility of reverter affords no opportunity to cure the occurrence of, or failure to

meet, any specified condition because the termination of a fee simple determinable is "automatic[]." <u>Jedlicka</u>, 42 A.3d at 267. Had the parties desired Section C.7th to apply to the habendum clause, they could have created a fee simple subject to condition subsequent and placed specific parameters on plaintiffs' right of re-entry. <u>See</u> <u>Jacobs</u>, 332 F. Supp. 2d at 773 (citing <u>Higbee</u>, 428 A.2d at 595).

The language of the habendum and notice clauses further supports plaintiffs' interpretation that the opportunity to cure does not extend to the habendum clause. The notice clause excuses a lessee's failure to fulfill lease covenants when "laws, orders, rules or regulations, acts of God [], wars, civil disturbances, insurrections, riots, epidemics, equipment or pipeline breakdown or freeze-up, or similar causes not reasonably within the control of [the lessee]" inhibit the lessee from fulfilling its obligations. (Doc. 7-7 at 5 C.7th; Doc. 7-8 at 5 C.7th). Per the habendum clause, the leases will extend beyond the primary term "as long thereafter as . . . (5) a completed oil or gas well would be capable of producing oil or gas . . . but for acts of God, unavailability or interruption of markets or pipelines, delays due to pending governmental or regulatory authorization, or any other causes" which prevent the lessee from commencing or continuing production. (Doc. 7-7 at 3; Doc. 7-8 at 3). Applying the notice clause as SWN requests would render the fifth condition of the habendum clause surplusage. To give all provisions of the agreement effect, <u>see</u> <u>Razumic</u>, 390 A.2d at 739, we must interpret the leases to mean that the notice clause does not apply to the habendum clause. Accordingly, SWN's motion to dismiss plaintiffs' amended complaint as premature will be denied.

## 2.   *Due Diligence*

Distilled to its essence, the parties' substantive disagreement as to Count II centers on what constitutes continuance of drilling operations with due diligence within the meaning of the leases' habendum clauses.  (Compare Doc. 26 with Doc. 34 at 5-6).  In an oil and gas lease, the habendum clause fixes the ultimate duration of the lease.  Jedlicka, 42 A.3d at 267 (citing Jacobs, 332 F. Supp. 2d at 764 (citing 3 WILLIAMS & MEYERS, OIL AND GAS LAW § 601 (2003))).  Under the terms of the leases *sub judice*, a lessee can extend the leases beyond their primary term by meeting one of five conditions.  (Doc. 7-7 at 3; Doc. 7-8 at 3).  The parties disagree as to whether SWN satisfied the first condition, *viz*, whether drilling operations continued with due diligence within the primary term.[5]  (Compare Doc. 28 at 11-12 with Doc. 30 at 16-20 & n.7).

SWN argues that Count II should be dismissed because SWN engaged in pre-drilling activity sufficient to commence drilling operations and undertook said preparatory actions with due diligence.  (Doc. 30 at 16-21).  Plaintiffs only challenge whether drilling operations continued with due diligence, not whether operations commenced during the primary term.  (See Doc. 28 at 12).  According to the amended complaint, there were two drilling units in existence on December 8, 2015 that unitized portions of the subject properties and within which drilling operations

---

[5] In its motion, SWN quotes the habendum clauses' second condition, which states that the leases may be extended provided that a drilling permit application is filed prior to the expiration of the primary term and drilling operations commence and continue with due diligence within a reasonable time thereafter.  (Doc. 7-7 at 3; Doc. 7-8 at 3).  SWN does not explore applicability of this second condition.  (See Docs. 26, 30).

could be conducted, to wit: the Broughton South Drilling Unit and the Long Run Timber TI-24 East Gas Unit.  (Doc. 7 ¶¶ 60-62, 65-66, 75, 118, 140-142, 150).  SWN appears not to dispute the alleged inactivity at the Long Run Timber TI-24 East Gas Unit.  (Doc. 30 at 21 n.7).

Plaintiffs allege that no drilling operations continued on either of the two wells located in the Broughton South Drilling Unit.  Plaintiffs note that, following its incorporation into the Broughton South Drilling Unit, the inactive Broughton #5H Well was never perforated, hydraulically stimulated, connected to a pipeline, or capable of producing hydrocarbons.  (Doc. 7 ¶¶ 47, 57, 119).  They contend that spudding of the Broughton #3H Well on December 7, 2015 does not constitute continuing drilling operations with due diligence because spudding is merely the construction of a conductor hole.  (Id. ¶¶ 142-43).  Plaintiffs also note that since SWN received the well permit on August 20, 2015, the Broughton #3H Well was never perforated, hydraulically stimulated, connected to a pipeline, or capable of producing hydrocarbons.  (Id. ¶ 70).  SWN submitted a re-permit application for the Broughton #3H Well wherein SWN allegedly acknowledged that the Broughton #3H Well permit expired.  (Id. ¶¶ 72-73 (citing Doc. 8-13 at 4)).  Plaintiffs proffer this application as evidence of SWN's lack of due diligence, observing that the original permit for the Broughton #3H Well expired on August 20, 2016 "unless drilling is commenced on or before that date and prosecuted with due diligence."  (Id. ¶¶ 147-48 (citing Doc. 8-12 at 3)).

SWN rejoins that plaintiffs advance a definition of "drilling operations" in conflict with lease provisions.   Specifically, SWN avers that the leases impose no

requirement that drilling operations include perforation, hydraulic stimulation, pipeline connection, or production of hydrocarbons. (Doc. 30 at 13). Plaintiffs acknowledge the leases' definition of "operations" does not explicitly include these activities. (Doc. 34 at 5). They clarify that actions such as perforation, stimulation, completion, and connection to a pipeline are evidence that drilling operations are proceeding with due diligence because the ultimate objective of a well is to produce oil and gas in paying quantities. (Id. at 5-6).

SWN further contends that the amended complaint itself pleads facts that establish SWN continued drilling operations with due diligence both before and after December 8, 2015. (Doc. 30 at 20). Specifically, SWN avers that the following activities prior to December 8, 2015 show drilling operations continued with due diligence in the Broughton South Drilling Unit:

> (i) the setting of containment on the drilling and completions pad, (ii) the performance of a cement bond log on the Broughton #5H well, (iii) the removal of a bridge plug from the wellbore of the Broughton #5H well, and (iv) the running of a bit and scraper in the wellbore of the Broughton #5H well.

(Doc. 7 ¶ 89 (quoting Doc. 8-17 at 3)). In its October 19, 2016 letter, SWN also set forth several operations to be conducted on the Broughton #5H Well "in the near future." (Id. ¶¶ 89, 127 (quoting Doc. 8-17 at 3)).

In response to SWN's proffered activity on the Broughton #5H Well, plaintiffs state that the Broughton Unit, which included the Broughton #5H Well, dissolved on May 1, 2015 for "failure to establish unit production and the proper development of the reservoir underlying the Leases." (Id. ¶¶ 60-61 (quoting Doc. 8-9

at 3)).  Plaintiffs therefore allege that SWN's proffered activities prior to expiration of the primary term—insertion and removal of a bridge plug, performance of a cement bond log, and the running of a bit and scraper—are part and parcel of evaluating the condition of the "long-dormant" and unproductive Broughton #5H Well.  (Id. ¶¶ 129-32).  They also assert that the setting of containment on a well pad is a "housekeeping activity" and not "demonstrative of a diligent effort to secure oil and gas production."  (Id. ¶ 128).  No drilling operations purportedly occurred on the Broughton #5H Well from September 3, 2015 to December 8, 2015.  (Id. ¶ 119).  And plaintiffs note that the future scheduled activities outlined in SWN's letter did not occur within the nine months following expiration of the leases' primary terms.  (Id. ¶ 135).

Contrary to SWN's assertions, plaintiffs plead sufficient facts to support their allegation that SWN failed to conduct drilling operations on the subject properties with due diligence as of the date the leases' primary terms expired, December 8, 2015.  (Id. ¶ 186).  Whether a lessee prosecuted drilling operations continually with due diligence is a question reserved for the finder of fact.  See Jedlicka, 42 A.3d at 273 (citation omitted); Kennedy v. Crawford, 21 A. 19, 20 (Pa. 1891).  Plaintiffs allegations raise a plausible claim that SWN failed to conduct drilling operations continuously with due diligence prior to and through expiration of the leases' primary terms.  SWN's motion to dismiss Count II will be denied.

### B.  Quiet Title

SWN argues that plaintiffs' quiet title claim brought pursuant to Pennsylvania Rule of Civil Procedure 1061 ("Rule 1061") must be dismissed because

plaintiffs only allege ownership of surface rights on the subject properties.[6]  (Doc. 36 at 6-8).  The Supreme Court of Pennsylvania promulgated Rule 1061 in 1947 to "unify into one single procedure all of the diverse procedures by which clouds on title were formerly tried."  Siskos v. Britz, 790 A.2d 1000, 1007 (Pa. 2002) (internal quotation marks and citation omitted).  Accordingly, Rule 1061 neither creates a new action nor changes the substantive rights of the parties or jurisdiction of the courts.  Id.  In pertinent part, Rule 1061 provides that an action to quiet title may be brought "to compel an adverse party to file, record, cancel, surrender, or satisfy of record, or admit the validity, invalidity or discharge of, any document obligation or deed affecting any right, lien, title or interest in land."  PA. R. CIV. P. 1061(b)(3).

Possession is not a jurisdictional prerequisite to an action brought under Rule 1061(b)(3).  Pennsylvania v. Thomas E. Proctor Heirs Tr., No. 1:12-CV-1567, 2014 WL 3696288, at *6 (M.D. Pa. Apr. 10, 2014), report and recommendation adopted, No. 1:12-CV-1567, Doc. 28 (M.D. Pa. July 24, 2014) (Conner, C.J.).  At least one court within the Third Circuit has predicted that the Pennsylvania Supreme Court would broadly interpret Rule 1061 to grant a quiet title cause of action to the present owner of a premises as well as other parties "in any manner interested in" a particular conveyance.  Montgomery Cty., Pa. v. MERSCORP, Inc., 904 F. Supp. 2d 436, 445-47 & n.9, 449-50 (E.D. Pa. 2012).

---

[6] SWN initially argued that plaintiffs' quiet title claim must be dismissed because an action in ejectment is the appropriate vehicle when a party does not possess the land at issue.  (Doc. 30 at 21-22).  We construe SWN's admission that "possession under [Rule] 1061(b)(3) is not a jurisdictional prerequisite to commencing a quiet title action" as withdrawal of that position.  (See Doc. 26 at 6).

Plaintiffs adequately plead ownership of the subterranean oil and gas rights on the subject properties. According to the amended complaint, "[t]itle to the hydrocarbon formations underlying the Subject Property is owned by the Plaintiffs in this matter." (Doc. 7 ¶ 174). Plaintiffs posit that the leases expired on December 8, 2015 due to SWN's failure to continue drilling operations with due diligence and that all property interests conveyed through the leases automatically reverted to plaintiffs. (Id. ¶¶ 80, 85-86, 177, 191). Assuming *arguendo* that plaintiffs have not sufficiently pled ownership, they have pled sufficient interest in the conveyances at issue. Plaintiffs aver that SWN's actions and the dispute *sub judice* are preventing plaintiffs from marketing and developing the subterranean mineral formations to their financial detriment. (Id. ¶ 181). SWN's motion to dismiss Count I will be denied.

## IV.   Conclusion

For the foregoing reasons, the court will deny SWN's motion (Doc. 15) to dismiss plaintiffs' amended complaint. An appropriate order shall issue.

 /S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:    June 8, 2018