## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GARY R. BUTTERS, as Co-Trustee   :   **CIVIL ACTION NO. 4:17-CV-797**
of **THE BUTTERS CLINTON**   :
**COUNTY GAS PROTECTOR**   :   **(Chief Judge Conner)**
**TRUST, DAVID F. BUTTERS,**   :
individually, **TERRY L. BUTTERS,**   :
individually, and **GLEN E.**   :
**BUTTERS,** individually,   :
  :
      **Plaintiffs**   :
  :
    **v.**   :
  :
**SWN PRODUCTION COMPANY, LLC,** :
  :
     **Defendant**   :

## MEMORANDUM

This case involves a dispute over two oil and gas leases between plaintiffs and defendant SWN Production Company, LLC ("SWN"). Plaintiffs advance claims for quiet title and declaratory judgment. They specifically ask that we find that SWN is in violation of its lease agreements and no longer maintains an interest in the leased property. SWN now moves for summary judgment, claiming it has extended the leases by continuing drilling operations with due diligence and thus retains an interest in the leases. We will deny SWN's summary judgment motion.

# I. Factual Background & Procedural History[1]

Plaintiffs own several tracts of property in Morris Township, Tioga County, Pennsylvania, that are subject to two oil and gas leases: the "Butters Living Trust Lease" and the "David and Terry Butters Lease." (Doc. 72 ¶ 1). Plaintiffs are the lessors of the properties. (Id.) SWN is a Texas limited liability company engaged in the production of oil and gas. (Doc. 7 ¶ 5). SWN is the lessee of the two leases at issue in this case. (Doc. 72 ¶¶ 1, 8, 10; see also Doc. 72-1).

## A. Lease Assignments and Transfers

SWN obtained its interest in the leases through a complicated series of transactions involving a variety of entities that assigned their rights, titles, and interests in the Butters Living Trust Lease and the David and Terry Butters Lease. (See Doc. 7 ¶¶ 29-37). Two prior interest holders are particularly relevant here: Chesapeake Appalachia, LLC ("Chesapeake") and Southwestern Energy Production Company ("Southwestern Energy"). Chesapeake obtained an interest in the leases in 2010, retroactive to 2006, (Doc. 7 ¶ 30; Doc. 58 ¶ 30), and conducted drilling activities on the subject property, (Doc. 72 ¶ 7; Doc. 77 ¶ 7). Southwestern

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. Id. Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (See Docs. 72, 77). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

Energy is SWN's corporate predecessor.  (Doc. 7 ¶ 37; Doc. 58 ¶ 37).  Southwestern Energy first obtained an interest in the subject leases and property in January 2013. (Doc. 7 ¶ 33; Doc. 58 ¶ 33).  It obtained a greater interest in September 2014.  (Doc. 7 ¶ 36; Doc. 58 ¶ 36).  Southwestern Energy converted into SWN in January 2015. (Doc. 7 ¶ 37; Doc. 58 ¶ 37).  Upon conversion, SWN obtained a 100% interest in the leases.  (Doc. 72 ¶ 10; Doc. 77 ¶ 10).

### B.    Relevant Lease Provisions

The Butters Living Trust Lease covers just over 242 acres of land on plaintiffs' property.  (Doc. 7 ¶ 16; Doc. 72-1 at 3).  The David and Terry Butters Lease covers roughly 214 acres of land on plaintiffs' property with hydrocarbon rights under about 203 acres of the lot.  (Doc. 7 ¶ 17; Doc. 72-1 at 10).  The leases are identical in all relevant respects.  (Doc. 7 ¶¶ 18, 19, 21).

Both leases establish a primary term of five years.  (Id. ¶ 18).  That five-year period commenced on December 8, 2005, and was scheduled to terminate on the fifth anniversary of the leases' execution.  (Id.)  Under the leases, the lessee has an option to extend the primary term for an additional five years upon payment of $45 per net-acre.  (Id. ¶ 19).  This extension of the primary term takes effect on the date that the leases would have expired, in effect creating a ten-year primary term.  (Id.) Before the initial five-year primary term expired, the lessees exercised the option to extend the primary term to December 8, 2015.  (Doc. 72 ¶ 5; Doc. 77 ¶ 5).

The leases each contain a "habendum clause" setting forth five means by which the lessee can extend the leases beyond the primary term and into a

secondary term.  (<u>See</u> Doc. 72-1).  As relevant here, the habendum clauses provide

that the leases will "remain in full force and effect" beyond the primary term

> as long thereafter as (1) *drilling operations continue with due diligence*, provided that LESSEE has commenced drilling operations on any portion of the premises or any lands pooled or unitized therewith, within the primary term, (2) an application for a drilling permit is pending with the appropriate authorities, and LESSEE, after grant of such permit, commences drilling operations within a reasonable time thereafter and continues same with due diligence, provided said permit application was filed prior to the expiration of the primary term, (3) oil and gas or either of them is produced or withdrawn from any portion of the premises or any lands pooled or unitized therewith, (4) gas storage operations are conducted in or on any portion of the premises or (5) a completed oil or gas well would be capable of producing oil or gas from any portion of the premises or any lands pooled or unitized therewith, but for acts of God, unavailability or interruption of markets or pipelines, delays due to pending governmental or regulatory authorization, or any other causes, which have caused LESSEE not to commence production from such well or to suspend production from such well.

(<u>Id.</u> at 3, 10) (emphasis added).  The leases also define "operations":

> <u>Operations</u>.  Whenever used in this lease, the word "operations" (unless specified to the contrary) shall mean operations for and any of the following: dirt work, building of roads and locations, drilling, testing, completing, reworking, recompleting, deepening, plugging back, repairing, abandoning or dewatering (meaning pumping or flowing of water and/or associated hydrocarbons from a well) of a well in search of or in an endeavor to obtain, increase or restore and/or market or render marketable or more valuable production of oil or gas, and/or production, actual or constructive, of oil or gas.

(<u>Id.</u> at 5, 12).

### C. Broughton Pad and Drilling Activities

SWN's summary judgment motion concerns SWN's activities on what we will refer to as the "Broughton Pad." The Broughton Pad is found on SWN's leased land, on which SWN has drilled two wells: the "Broughton #5H well" and the "Broughton #3H well." (See Doc. 72 ¶¶ 23, 49).

#### 1. *SWN's "Continuous Operations Schedule"*

SWN claims that, in November 2015, it implemented a "Continuous Operations Schedule" guiding its operations on the Broughton Pad. (Id.) SWN further claims—and plaintiffs dispute—that Continuous Operations Schedules were part of its standard business practices in Pennsylvania at the time. (Id. ¶ 24; Doc. 77 ¶ 24). Plaintiffs also contest, citing expert testimony, whether Continuous Operations Schedules like the one used by SWN were part of the oil and gas industry's standard business practices in Pennsylvania. (Doc. 77 ¶ 24).

According to SWN, its Continuous Operations Schedule was designed to ensure that operations took place on the Broughton pad every 60 to 90 days. (Doc. 72 ¶ 25). SWN asserts that this Schedule was intended to guarantee that SWN "diligently . . . [met] lease development obligations." (Id.) Plaintiffs dispute whether SWN's Continuous Operations Schedule was in fact intended to satisfy its due diligence obligations under the leases and whether adherence to a Schedule like SWN's constitutes good faith behavior. (Doc. 77 ¶¶ 24-25). Plaintiffs rejoin that the Schedule was instead intended to comply with SWN's standard lease provision prohibiting the cessation of operations for more than 90 days. (Id. ¶ 25).

## 2.    *Initial Activities on the Broughton #5H Well*

In May 2011, Chesapeake drilled the Broughton #5H well to a total depth of 11,277 feet.  (Doc. 72 ¶ 7; Doc. 77 ¶ 7).  When SWN's predecessor, Southwestern Energy, first acquired an interest in the leases from Chesapeake in 2013, there was no pipeline connected to the pad.  (Doc. 72 ¶¶ 8-9; Doc. 77 ¶¶ 8-9).  SWN claims it had plans to complete the well at the time, (Doc. 72 ¶ 11), but plaintiffs dispute that claim, (Doc. Doc. 77 ¶ 11).[2]  Southwestern Energy obtained a greater interest in the leases in September 2014 before converting into SWN in January 2015. (Doc. 7 ¶¶ 36, 37; Doc. 58 ¶¶ 36, 37).

In June 2015, SWN filed an application for inactive well status for the Broughton #5H well with the Pennsylvania Department of Environmental Protection ("DEP").  (Doc. 72 ¶ 17; Doc. 77 ¶ 17).  SWN's application described the Broughton #5H well as a "[t]emporarily abandoned well awaiting installation of a pipeline."  (Doc. 72 ¶ 17; Doc. 77 ¶ 17; Doc. 72-13 at 2).  SWN withdrew its application for inactive status in January 2016.  (Doc. 72 ¶ 28; Doc. 77 ¶ 28).

## 3.    *Transition to the Broughton #3H Well and Work on the Broughton Pad*

In April 2015, before SWN applied for inactive status on the Broughton #5H well, it scheduled surveys for a second well—the Broughton #3H well—to be drilled

---

[2] SWN asserts that SWN (or Southwestern Energy) took steps to evaluate the Broughton #5H well upon obtaining its interest.  (See Doc. 72 ¶¶ 12, 13).  SWN cites deposition testimony of Scott Elliot as support but fails to include that testimony in its cited exhibit.  (Id. (citing Doc. 72-5)).  We will not credit assertions lacking an evidentiary basis.  See FED. R. CIV. P. 56(c)(1).

on the Broughton Pad. (Doc. 72 ¶ 15; Doc. 77 ¶ 15). Using those surveys, SWN filed a well location plat for the Broughton #3H well with the DEP. (Doc. 72 ¶ 16; Doc. 77 ¶ 16). SWN submitted a permit application to the DEP to drill the Broughton #3H well in July 2015. (Doc. 72 ¶ 19; Doc. 77 ¶ 19). DEP approved the application in August 2015. (Doc. 7 ¶ 66; Doc. 58 ¶ 66).

Various construction activities took place on the Broughton Pad between June 2015 and December 2015, including, for example, paving the entrance to the Pad. (Doc. 72 ¶¶ 18, 20). SWN also describes various operations related to drilling on the Broughton #3H well before the expiration of the primary term. Specifically, SWN conducted activities like "spudding, drilling conductor hole, installing cellar, setting wellhead cage and disposing of drilling waste." (Id. ¶ 21).

Testimony from SWN officials suggests that the Broughton Pad was put on a Continuous Operations Schedule. (Id. ¶ 23). Plaintiffs agree that the Broughton #3H well was put on the Continuous Operations Schedule, but cite internal SWN reports that indicate the Broughton #5H well was omitted from the Continuous Operations Schedule. (Doc. 77 ¶ 23). Plaintiffs also disagree with SWN's assertion that the Broughton #3H well was "spud" before the expiration of the primary term, pointing to an SWN Continuous Operations Report that suggests spudding

occurred at a later date.[3]  (Doc. 77 ¶¶ 22, 23; <u>see also</u> Doc. 108-4).  Lastly, the parties refer to competing evidence regarding whether SWN intended to drill the Broughton #3H well to total depth then (when SWN claims the well was "spud") or later (when the well was scheduled to be "set").  (Doc. 72 ¶ 22; Doc. 77 ¶ 22).

    **4.**    ***Transition Back to the Broughton #5H Well and Drilling Activities on the Broughton #5H Well***

In another factual dispute, the parties offer conflicting evidence of SWN's intentions as to the Broughton #5H well and its motivations for transitioning from the Broughton #3H well back to the Broughton #5H well.  Plaintiffs point to evidence that SWN was uncertain about whether it intended to complete the Broughton #5H well in 2016.  (Doc. 77 ¶ 26).  SWN withdrew its application for inactive status of the Broughton #5H well in January 2016.  (Doc. 72 ¶ 28).  Yet plaintiffs refer to various SWN emails from early 2016 indicating that the Broughton #5H well remained on "inactive" status, (<u>see</u> Doc. 77 ¶ 26 (citing Doc. 88)), as well as SWN documents indicating that the Broughton #5H well was not scheduled for activities, (<u>id.</u> (citing Doc. 108-4)).  Plaintiffs also cite evidence indicating that the transition from the Broughton #3H well back to the Broughton #5H well was

---

[3] Plaintiffs alleged in their complaint, and SWN admitted in its answer, that the Broughton #3H well was spud on December 7, 2015.  (Doc. 7 ¶ 68; Doc. 58 ¶ 68).  However, we will not bind plaintiffs to this allegation.  Plaintiffs are entitled to alter their understanding of the facts after obtaining new information during discovery.  Indeed, plaintiffs need only plead "enough facts to raise a reasonable expectation that discovery will reveal evidence" relevant to plaintiffs' claims.  <u>Phillips v. Cty. of Allegheny</u>, 515 F.3d 224 (3d Cir. 2008) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 557 (2007).  We therefore anticipate that allegations may be changed or updated during discovery.  <u>See</u>, <u>e.g.</u>, <u>Troung v. Rodriguez</u>, No. 13-2808, 2014 WL 12569365, at *2 n.1 (E.D. Pa. Oct. 23, 2014).

prompted by a desire to save money, not to obtain drilling knowledge. (Id. ¶ 27).
Plaintiffs also reference evidence to demonstrate that SWN has not established
when SWN decided to transition from one well to another. (Id. ¶ 26).

SWN cites competing evidence suggesting that it transitioned back to the
Broughton #5H well because "it was a better course of action to complete the
Broughton #5H" well. (Doc. 72 ¶ 26). According to SWN, testimony demonstrates
that completion of that well would "provide SWN with knowledge that it then could
use in the drilling and completing of the Broughton #3H" well. (Id. ¶ 27).

SWN also cites various activities it undertook on the Broughton Pad and the
Broughton #5H well. (See Doc. 72 ¶¶ 29-48, 52-55). Those activities are as follows:

- *February 2016* – SWN undertook containment setting activities, like
  installation of geolaminate liner, on the Broughton Pad. (Doc. 72 ¶ 29).

- *March 2016* – Sand bags were trucked and delivered to the Broughton
  Pad. (Doc. 72 ¶ 31). According to a March 2016 DEP Surface Activities
  Inspection Report, a liner had been placed across the center of the Pad
  and the well site was permanently stabilized, but it was not bermed to
  form a containment structure. (Id. ¶ 32). SWN also ordered five more
  geolaminate liners for the Broughton Pad, scheduled for a March 2016
  delivery, and equipment for well test fluid recycling was delivered to the
  Pad. (Doc. 72 ¶¶ 33, 34).

- *May 2016* – SWN initiated downhole operations for the Broughton #5H
  well by "running a cement bond log to evaluate downhole conditions, to
  confirm that there were no issues during the cement job, and to assess the
  integrity of the existing cement around the well casing in order to ensure
  that the well was safe to complete." (Id. ¶ 35).

- *June 2016* – SWN "tested wellhead components and removed the bridge
  plug placed by Chesapeake to accommodate SWN's access to certain
  zones for fracing." (Id. ¶ 36).

- *August 2016* – The Broughton Pad was equipped with a workover rig and
  support equipment. (Id. ¶ 37). Bit and scraper work also took place on

the Pad to ensure that the wellbore was free of debris and obstruction after the bridge plug was removed. (Id. ¶ 38).

- *October 2016* – SWN supplemented containment on the Pad, conducted a "casing integrity test," and tried to set a bridge plug with a coil tubing to seal off existing perforations. (Id. ¶ 39).

- *December 2016* – A service rig was moved onto the Pad and coiled tubing was delivered. (Id. ¶ 40). Also, "heaters were put on the wellhead, pressure tests were performed, produced fluid was hauled off location . . . , and the cast iron bridge plug was again set using a coil tubing unit." (Id. ¶ 41, see also id. ¶ 42).

SWN identifies additional drilling-related activities continuing into 2017. Those activities include:

- *February 2017* – Tubing conveyed perforation was performed on the Broughton #5H well. (Id. ¶ 43).

- *March 2017* – Frac tanks were moved to the Broughton Pad. (Id. ¶ 44).

- *April 2017* – Hydraulic fracturing and additional perforating occurred during 13 stages. (Id. ¶ 45).

- *May-June 2017* – SWN conducted post-frac activities, (id. ¶ 46), and production tubing was placed on the Broughton #5H well, (id. ¶ 47).

- *August 2017* – Flowback and flaring occurred at the Broughton #5H well during a two-week period. (Id. ¶¶ 48, 50). SWN attempted to tender checks to plaintiffs for royalties and shut-in payments associated with the produced gas, (Doc. 72 ¶ 51), but plaintiffs did not deposit the checks, (Doc. 77 ¶ 51). The Broughton #5H well was shut in after flaring. (Doc. 72 ¶ 52).

With the exception of SWN's purported containment-setting activities, the timing of the placement of pad liner, and the purported profitability of gas production in August 2017, plaintiffs do not dispute that these activities took place. They simply disagree that the activities are indicative of due diligence. (See Doc. 77 ¶¶ 29-48, 52-55). The parties also agree that no pipeline has ever been connected to the Broughton Pad or its wells, (Doc. 72 ¶ 53), and that gas cannot be sent to market

without a pipeline, (id. ¶ 54).  SWN offers testimonial and documentary evidence indicating it is attempting to develop a pipeline with a third-party contractor.  (Id. ¶ 55).  Plaintiffs note the lack of evidence justifying the delay between the drilling of the Broughton #5H well and the development of a pipeline.  (Doc. 77 ¶ 55).

### C.  Procedural History

Plaintiffs brought this suit against SWN in the Court of Common Pleas of Tioga County, Pennsylvania.  SWN removed the case to federal court on diversity grounds.  The case is now proceeding on plaintiffs' first amended complaint, which asserts claims for quiet title and declaratory judgment.[4]  SWN moved to dismiss plaintiffs' amended complaint.  We denied that motion in a June 8, 2018 memorandum and accompanying order.  SWN now moves for summary judgment. Briefing is complete and the motion is ripe for disposition.

## II.  Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  FED. R. CIV. P. 56(a).  The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The court is to view the evidence "in the light most

---

[4] A second defendant named in the complaint, Mitsui E&P USA, LLC, has been voluntarily dismissed by the plaintiffs.  (See Doc. 46).

favorable to the non-moving party and draw all reasonable inferences in that party's favor." Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. See Pappas, 331 F. Supp. 2d at 315.

## III. Discussion

The issue in this case is narrow: Whether SWN complied with its contractual obligation to continue "drilling operations . . . with due diligence" such that it extended the leases from the primary term to the secondary term. In its motion for summary judgment, SWN claims that it has acted with the requisite due diligence. SWN points to indicators of its business judgment, good-faith efforts to develop the land, and its use of a Continuous Operations Schedule designed to ensure consistent operations. Plaintiffs disagree and argue that SWN's conduct falls short of its contractual due diligence obligation. We hold that genuine disputes of material fact regarding SWN's due diligence preclude summary judgment.

### A. Contract Interpretation Principles[5]

Under Pennsylvania law, an oil and gas lease is of the same nature as a contract. See T.W. Phillips Gas & Oil Co. v. Jedlicka, 42 A.3d 261, 267 (Pa. 2012)

---

[5] Pennsylvania contract law governs this diversity action. See Lafferty v. St. Riel, 495 F.3d 72, 76 (3d Cir. 2007) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)).

(citing <u>Willison v. Consol. Coal Co.</u>, 637 A.2d 979, 982 (Pa. 1994)). The parties' intent is the foremost consideration in interpreting contracts, including oil and gas leases. <u>See</u> <u>Hutchinson</u>, 519 A.2d at 389-90. Pennsylvania contract interpretation thus begins with the "firmly settled" principle that the intent of the contracting parties should be gleaned from the writing itself. <u>Norfolk S. Ry. Co. v. Pittsburgh & W. Va. R.R.</u>, 870 F.3d 244, 253 (3d Cir. 2017) (citations omitted). The court must interpret the writing "as a whole, giving effect to all its provisions," <u>Atl. Richfield Co. v. Razumic</u>, 390 A.2d 736, 739 (Pa. 1978) (citations omitted), and be guided by the plain meaning of the language employed by the parties rather than their "silent intentions," <u>Jedlicka</u>, 42 A.3d at 267.

The terms of oil and gas leases should also be interpreted in light of the "highly technical and well-developed industry" they are used in. <u>Jacobs v. CNG Transmission Corp.</u>, 332 F. Supp. 2d 759, 772 (W.D. Pa. 2004) (citation omitted); <u>see also</u> <u>Nolt v. TS Calkins & Assocs., LP</u>, 96 A.3d 1042, 1046 (Pa. Super. Ct. 2014) (citations omitted). They should therefore be construed "with due regard to the known characteristics" of the particularized nature of the oil and gas industry. <u>Camp Ne'er Too Late, LP v. Swepi, LP</u>, 185 F. Supp. 3d 517, 544 (M.D. Pa. 2016) (citing <u>Franklin Sugar Ref. Co. v. Howell</u>, 118 A. 109, 110 (Pa. 1922)).

### B. "Due Diligence" and SWN's Performance Under the Leases

The habendum clauses in the leases at issue provide, in relevant part, that the leases will "remain in full force and effect" beyond the primary term "as long thereafter as . . . drilling operations continue with due diligence." (Doc. 72-1 at 3, 10). The parties dispute two issues regarding the leases' "due diligence" provisions:

(a) the appropriate standard for evaluating whether SWN acted with due diligence; and (b) whether SWN's conduct in fact satisfies the due diligence standard.

### 1. *Applicable "Due Diligence" Standard*

We start with a brief overview of habendum clauses in the oil and gas industry. The habendum clause fixes the ultimate duration of the lease, which may include a primary and secondary term. <u>Jedlicka</u>, 42 A.3d at 267 (citing <u>Jacobs</u>, 332 F. Supp. 2d at 764 (citing 3 WILLIAMS & MEYERS, OIL AND GAS LAW § 601 (2003))); 2 NANCY SAINT-PAUL, SUMMERS OIL AND GAS § 14:2 (3d ed. 2011)). The primary term is the "period of time at the end of which the leasehold estate granted will terminate." 2 SUMMERS OIL AND GAS § 14:2. At the end of the primary term, the lease either ends or is extended into the secondary term. <u>Id.</u> Modern habendum clauses include a vehicle to extend the lease beyond the primary term and into the secondary term under certain contractually agreed-upon conditions. <u>Id.</u> § 14:9. The habendum clauses in this case provide for extension into the secondary term if, *inter alia*, drilling operations commenced during the primary term continue with "due diligence." (Doc. 72-1 at 3, 10).

SWN argues that the due diligence standard in these habendum clauses is informed by the implied duty of exploration and development. (Doc. 73 at 6 (citing <u>Aye v. Phila. Co.</u>, 44 A. 555, 556 (Pa. 1899)). Under SWN's suggested standard, courts must ask whether the lessee's conduct is an exercise of its business judgment—a subjective inquiry—by comparing the activity in question to the lessee's normal course of business. (<u>Id.</u> (citing <u>Aye</u>, 44 A. at 556)). According to SWN, a lessee's business judgment prevails unless it acted in bad faith or

fraudulently. (Id. at 6-7 (citing Colgan v. Forest Oil Co., 45 A. 119, 121 (Pa. 1899);

Young v. Forest Oil Co., 45 A. 121, 122 (Pa. 1899))). And a lessee cannot be found to

have acted in bad faith, says SWN, if it has engaged in operations that resulted in a

well capable of producing gas in "paying quantities." (Id. at 9 (citing Roe v. Chief

Expl. & Dev. LLC, No. 4:11-CV-579, 2013 WL 4083326, at *9 (M.D. Pa. Aug. 13,

2013))). Plaintiffs, citing cases outside the oil and gas context, assert that a more

generic due diligence standard applies that tasks us with reviewing the objective

reasonableness of the lessee's conduct under the lease. (Doc. 78 at 7-9).

　　　The implied duty to explore and develop the land with reasonable diligence

applies when the landowner's only form of compensation is royalty payments

resulting from the extraction of gas. See Jacobs v. CNG Transmission Corp., 772

A.2d 445, 455 (Pa. 2001). That implied obligation does not apply, however, when

"the contract . . . clearly set[s] forth the parties' expectations regarding development

of the property." Id. at 453 (citing Stoddard v. Emery, 18 A. 339, 339 (Pa. 1889)); see

also id. at 455; Hutchison v. Sunbeam Coal Corp., 519 A.2d 385, 388 (Pa. 1986).

Thus, "where the parties have expressly agreed on what shall be done, there is no

room for the implication of anything not so stipulated for." Aye, 44 A. at 556.

　　　SWN cites the Pennsylvania Supreme Court's decision in Aye v. Philadelphia

Co., 44 A. 555 (Pa. 1899), to help define the leases' due diligence obligation. Like

here, the plaintiffs in Aye claimed the lessees no longer retained an interest in the

leased property. Id. at 555. Unlike here, the plaintiffs in Aye brought their suit

under the leases' clause governing the parties' rights and expectations if the lessee

"produces oil in paying quantities." Id. at 556. The lease there expressly described

the parties' rights and obligations in the specific event that a test well produced oil in "paying quantities." Id. Yet it failed to guide the parties in the event the well ran dry, which it did. Id. Because the contract failed to cover that situation, the Court imposed "an implied obligation on the lessee to proceed with the exploration and development of the land with reasonable diligence, according to the usual course of the business, and a failure to do so amounts to an abandonment." Id.

Aye is distinguishable for two reasons. *First*, the lease here defines the parties' expectations regarding the property. The provision at issue states that SWN must continue drilling operations with "due diligence" to trigger extension into the secondary term. (Doc. 72-1 at 3, 10). The parties have therefore "expressly agreed on what shall be done" to extend the leases into the secondary term. Aye, 44 A. at 556. Thus, no implied duty applies because the provision put in issue by plaintiffs plainly governs the parties' conduct. We will not "imply a different contract than that which the parties have expressly adopted." Hutchison, 519 A.2d at 388; see also Jacobs, 772 A.2d at 453-54 (citing Aye, 44 A. at 555-56).

*Second*, plaintiffs here brought suit under the leases' "due diligence" provision, not a provision synonymous with the "paying quantities" provision in Aye. True, the leases here also provide for extension into the secondary term if "oil and gas or either of them is produced or withdrawn from any portion of the premises or any lands pooled or unitized therewith." (Doc. 72-1 at 3, 10). Also true, the word "produced" is generally synonymous with "produced in paying quantities." See, e.g., Garcia v. King, 164 S.W.2d 509, 512 (Tex. 1942) (citations

omitted); see also 2 SUMMERS OIL AND GAS § 14:11.  But plaintiffs have not challenged SWN's conduct under those provisions.[6]

SWN's reliance on Young v. Forest Oil Co., 45 A. 121 (Pa. 1899), and Colgan v. Forest Oil Co., 45 A. 119 (Pa. 1899), is misplaced for the same reason.  (Doc. 73 at 6-7).  The Pennsylvania Supreme Court in Young held that the lessee's good faith business judgment prevails when the lessor claims that the lessee has failed to produce gas in "paying quantities."  Young, 45 A. at 122-23.  The Colgan Court expanded on Young's concept of good faith business judgment.  Colgan, 45 A. at 119.  And the Pennsylvania Supreme Court has since interpreted both cases as defining a lessee's responsibilities when performing under a "paying quantities" clause.  See generally Jedlicka, 42 A.3d 261.  Plaintiffs, however, have not sued under the leases' produce "in paying quantities" clause.  The standards articulated in Colgan and Young—like the Aye standard—are therefore inapplicable.

With that, we are left with the leases' plain terms.  As we have noted, the leases allow for extension from the primary to the secondary term if "drilling operations continue with due diligence."  (Doc. 72-1 at 3, 10).  Plaintiffs argue that the leases' terms call for a more generic due diligence test.  We agree.  Black's Law Dictionary Defines "due diligence" as the "[t]he diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation."  *Diligence*, BLACK'S LAW DICTIONARY (8th ed. 2004).

---

[6] Even if the Aye standard were to apply, whether the lessee has abandoned property is "usually a question for the jury" and is rarely appropriate for summary judgment.  Aye, 44 A. at 556; see also McMillin v. Titus, 72 A. 240, 244 (Pa. 1909).

At least one other court in this district has adopted a context-specific standard in an oil and gas case involving a similar lease that permitted extension into the secondary term upon continued operational due diligence. <u>See</u> <u>Good Will Hunting Club, Inc. v. Range Res.-Appalachia, LLC</u>, No. 4:11-CV-1152, 2013 WL 2297170, at *4-5, 17-18 (M.D. Pa. May 24, 2013). This standard aligns with our pronouncement that due diligence inquiries are inherently fact- and context-specific. (<u>See</u> Doc. 56 at 19). This is the appropriate test under these leases.

### 2. *SWN's "Due Diligence" in Continuing Drilling Operations*

We now review SWN's conduct to determine if there are any genuine disputes of material fact as to whether it acted with the requisite due diligence to extend its leases from the primary term to the secondary term. Before reviewing the parties' arguments, it behooves us to reiterate that whether a lessee pursued drilling operations with due diligence is a question for the finder of fact. <u>See</u> <u>Jedlicka</u>, 42 A.3d at 273 (citation omitted); <u>Kennedy v. Crawford</u>, 21 A. 19, 20 (Pa. 1891). We also note that the definition of "drilling operations" is exceedingly broad under both the leases at issue and case law. (<u>See</u> Doc. 72-1 at 3, 19); <u>see</u> <u>also</u> <u>generally</u> <u>Roe v. Chief Expl. & Dev. LLC</u>, No. 4:11-CV-579, 2013 WL 4083326 (M.D. Pa. Aug. 13, 2013). Therefore, unless there is *no* dispute as to any material fact, the issue of diligence is reserved for trial. Plaintiffs claim there are genuine disputes over various material facts. We take up each dispute in turn.

### i. <u>Continuous Operations Schedule</u>

Plaintiffs' primary argument is that SWN's mere adoption of and adherence to a Continuous Operations Schedule does not amount to due diligence. (Doc. 78

at 7-9).  They claim the Schedule is arbitrary and not designed with the sincere goal of expeditiously completing a well.  (Id.)  They additionally argue that SWN's performance purportedly pursuant to its Continuous Operations Schedule is indicative of a lack of due diligence.  (Id. at 15-16; Doc. 87 at 2-4).

Neither the parties nor the court have identified case law interpreting Continuous Operations Schedules—or analogous standardized operating schedules—and their value in determining a party's diligence.  Employing our common sense, we note that the creation and implementation of a Continuous Operations Schedule by itself is neither *per se* evidence of a lack of, nor definitive proof of, due diligence.  Whether adopting and executing a Continuous Operations Schedule is an exercise of due diligence depends on the norms of this "highly technical and well-developed" industry.  See Jacobs, 332 F. Supp. 2d at 772; see also Nolt, 96 A.3d at 1046.  That determination is heavily fact-dependent.

SWN claims that it routinely uses Continuous Operations Schedules in the Commonwealth and its use here therefore constitutes due diligence.  (Doc. 72 ¶ 24).  Plaintiffs doubt whether such Schedules are standard SWN practice but fail to cite contradictory evidence.  (Doc. 77 ¶ 24).  Instead, they marshal the opinion of their expert, Randall M. Albert, to argue that SWN's Continuous Operations Schedule

and its conduct thereunder is not "routine, normal or typical." (Doc. 112 at 23).[7] On

this point, the acceptable practices and prevailing norms with regard to drilling

operations in the Commonwealth bear directly on the reasonableness and diligence

of SWN's conduct. Resolution of this factual dispute thus "might affect the outcome

of the suit under the governing law." <u>Liberty Lobby</u>, 477 U.S. at 248. The parties

therefore dispute a material fact.

Moreover, the parties debate whether SWN diligently conducted drilling

operations pursuant to its Schedule. According to SWN, their Schedule is designed

to ensure some "physical operation necessary to develop a well was conducted on a

certain well pad every 60-90 days." (Doc. 72 ¶ 25). Plaintiffs note that SWN's

operational reports do not document any activities on the Broughton Pad for a

---

[7] Federal Rule of Civil Procedure 56(c)(1)(B) requires that a party making factual assertions support its assertions with "admissible evidence." SWN has not objected that Mr. Albert's expert opinion is inadmissible and we reserve judgment on that question. However, Mr. Albert's conclusion that "SWN failed to pursue [drilling] operations with due diligence or good faith and is thereby in breach of the leases" constitutes an improper legal conclusion. <u>See</u> <u>Berckeley Inv. Grp., Ltd. v. Colkitt</u>, 455 F.3d 195, 217 (3d Cir. 2006) (citing <u>First Nat'l State Bank v. Reliance Elec. Co.</u>, 668 F.2d 725, 731 (3d Cir. 1981)); <u>Burkhart v. Wash. Metro. Area Transit Auth.</u>, 112 F.3d 1207, 1212 (D.C. Cir. 1997) (citing <u>Torres v. Oakland</u>, 758 F.2d 147, 150 (6th Cir. 1985)); <u>see</u> <u>also</u> <u>Smith v. Allstate Ins. Co.</u>, 912 F. Supp. 2d 242, 253 (W.D. Pa. 2012) (citations omitted) (bad faith); <u>Greene v. Sears Prot. Co.</u>, No. 15 CV 2546, 2018 WL 4716189, at *9 (N.D. Ill. Mar. 8, 2018), <u>report and recommendation adopted</u>, 2018 WL 3104300 (N.D. Ill. June 25, 2018); <u>FNB Bank v. Park Nat'l Corp.</u>, 996 F. Supp. 2d 1187, 1192 (S.D. Ala. 2014). For now, we nonetheless credit Mr. Albert's factual statements, as well as his experience-based opinions regarding industry norms and practices. <u>See</u> <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 156 (1999); <u>see</u> <u>also</u> <u>Wolfe v. Allstate Prop. & Cas. Ins. Co.</u>, No. 4:10-CV-800, 2012 WL 12929814, at *3 (M.D. Pa. July 23, 2012) (citations omitted); <u>Clemens v. N.Y. Cent. Mut. Fire Ins. Co.</u>, No. 3:13-CV-2447, 2015 WL 3742130, at *4 (M.D. Pa. June 15, 2015). SWN is free to challenge Mr. Albert's opinions at a later date.

six-month period in late 2015 and early 2016. (Doc. 78 at 15; Doc. 87 at 3). SWN responds with deposition testimony explaining that various on- and off-site activities were undertaken during that period. (Doc. 72 ¶¶ 26-34). We do not make credibility determinations or weigh evidence at summary judgment. Carvalho-Grevious v. Del. State Univ., 851 F.3d 249, 262 (3d Cir. 2017) (citing Liberty Lobby, 477 U.S. at 255); Liberty Lobby, 477 U.S. at 249. The parties' competing evidence and factual disagreement over whether SWN followed its Schedule creates yet another dispute of material fact regarding SWN's diligence.

Several other issues disputed by the parties likewise fall within the province of the factfinder at trial. For example, plaintiffs contend that aspects of SWN's conduct—including its adoption of a Continuous Operations Schedule, the order in which it performed certain activities, the amount of time it took to perform those activities, and the absence of a pipeline—are indicative of SWN's bad faith. (Doc. 78 at 17-21). Bad faith is routinely treated as a context-specific issue for the fact-finder. See, e.g., Justofin v. Metro. Life Ins. Co., 372 F.3d 517, 523-24 (3d Cir. 2004) (citation omitted), as amended (Aug. 12, 2004) (insured's intent and related state of mind); Huang v. BP Amoco Corp, 271 F.3d 560, 565 (3d Cir. 2001) (citations omitted) (implied covenant of good faith); Weaver v. Lancaster Newspapers, Inc., 926 A.2d 899, 907 (Pa. 2007) (quoting St. Amant v. Thompson, 390 U.S. 727, 732 (1968)) (defamation); Birth Ctr. v. St. Paul Cos., 787 A.2d 376, 383-84 (Pa. 2001) (insurer bad faith); Pressey v. McCornack, 84 A. 427, 428 (Pa. 1912) (citations omitted) (substantial performance of a contract); Henderson v. Ferrell, 38 A. 1018, 1018-19 (Pa. 1898) (commencement of oil and gas operations).

To the extent plaintiffs ask us to conclude that SWN acted in bad faith—and therefore with a lack of due diligence—because some of its conduct (like transitioning from the Broughton #3H well to the Broughton #5H well) suggests ill intent, that decision necessarily involves a credibility determination. That is, it requires weighing of the parties' explanations for why they did or did not take certain action at certain times. Again, credibility determinations are inappropriate at the summary judgment stage. See Carvalho-Grevious, 851 F.3d at 262 (citing Liberty Lobby, 477 U.S. at 255); see also Justofin, 372 F.3d at 524 (citing Riehl v. Travelers Ins. Co., 772 F.2d 19, 24 (3d Cir. 1985)). These disputes of material fact preclude summary judgment.

### ii. Drilling to Completion of a Well as "Due Diligence"

SWN also argues that its specific conduct is irrelevant because it has established its due diligence—and therefore extended the leases into the secondary term—by drilling a well to completion on the Broughton Pad. (Doc. 79 at 13-17). For support, SWN relies on the "practical rule" adopted by Judge Brann in Roe v. Chief Exploration & Development LLC, No. 4:11-CV-579, 2013 WL 4083326 (M.D. Pa. Aug. 13, 2013). The issue in Roe was whether the lessee had sufficiently commenced "operations" on the property to extend the lease from its primary term to its secondary term. Roe, 2013 WL 4083326, at *5. Judge Brann held that a lessee acts in good faith—and is deemed to have timely commenced drilling operations— when it conducts preliminary acts during the primary term and proceeds to drill to completion of a well. Id. at *9. SWN also cites Pemco Gas, Inc. v. Bernardi, 5 Pa. D. & C.3d 85 (Pa. Ct. Com. Pl. 1977), which similarly held that preliminary acts

followed by the successful completion of a well establish the lessee's good faith commencement of operations. <u>Pemco</u> Gas, 5 Pa. D. & C.3d at 91-94, 100-101.

We agree with both <u>Roe</u> and <u>Pemco</u> that completion of preliminary acts, followed by completion of a well, establishes the lessee's good faith commencement of operations. But that is not at issue in this case. This case centers on SWN's continued due diligence or lack thereof *beyond* the primary term. The issue of continued due diligence necessarily implicates different considerations than the issue of commencing operations or the definition of "operations."

### iii. <u>Time Required to Drill a Well to Completion</u>

Plaintiffs next contend that SWN's conduct lacked the requisite due diligence because it took longer to complete the Broughton #5H well than it did for well operators in other cases. (Doc. 78 at 9-11). The leases at issue do not specify a time within which the lessee must complete a well. Ordinarily, absent an express timetable to complete a well, "the law implies that it shall be done within a reasonable time." <u>Field v. Golden Triangle Broad., Inc.</u>, 305 A.2d 689, 694 (Pa. 1973) (citations omitted)); <u>Hodges v. Pa. Millers Mut. Ins. Co.</u>, 673 A.2d 973, 974-75 (Pa. Super. Ct. 1996) (citing RESTATEMENT (SECOND) OF CONTRACTS § 204 (AM. LAW INST. 1981)). The time in which SWN must act under the habendum clauses at bar thus depends on the circumstances surrounding the well and its operator. We nonetheless credit plaintiffs' point that disparities in the time it takes to finish a well may bear on the lessee's diligence. In this case, given its unique set of facts, a fact finder could readily determine that SWN took an unreasonably long period of time to complete its drilling activities, suggesting a lack of due diligence. As a matter of

law, this timing question is neither irrelevant nor dispositive, but it is best addressed at trial.

### iv.    **Unavailability of a Pipeline**

Lastly, SWN insists that we must consider the unavailability of a gas pipeline when evaluating its diligence. (Doc. 73 at 11-12; Doc. 79 at 11 n.5). SWN asserts that it should not be faulted for failing to perform drilling operations more quickly given the reality that gas could not be transported to market. (Doc. 73 at 12). We agree that the unavailability of a pipeline is a relevant consideration unique to the oil and gas industry. See McKnight v. Mfrs. Nat. Gas Co., 23 A. 164, 165 (Pa. 1892). Plaintiffs do not appear to dispute this fact. They riposte that SWN's argument— that it performed its activities in a calculated manner with knowledge that no pipeline existed—is evidence of a lack of good faith and thus below its due diligence obligation. (Doc. 78 at 21). Plaintiffs point to other pipeline projects (like the Trans-Alaska pipeline) to demonstrate that SWN's failure to procure a pipeline is indicative of a lack of due diligence. Nevermind that the Trans-Alaska pipeline is factually and geographically distinguishable, plaintiffs fail to show why SWN's measured approach to performing its drilling activities was motivated by ill intent or why the failure to construct a pipeline with the assistance of a third-party is any fault of its own. The absence of a pipeline certainly does not automatically excuse conduct that falls below a contract's "due diligence" requirement. And this fact may become more relevant during trial. But the lack of a pipeline also does not *ipso facto* establish a lack of due diligence or bad faith, nor preclude a finding of good

faith.  As with the other indicators of diligence and intent, significance of the lack of a pipeline, as well as SWN's performance in light thereof, are issues for trial.

IV.    **Conclusion**

The court will deny SWN's motion (Doc. 71) for summary judgment.  An appropriate order shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania


Dated:    March 30, 2020